No. 36,980

H. J. UHL and GRACE L. UHL, Copartners, doing business as H. J. UHL, *Appellees,* v. PHILLIPS PETROLEUM COMPANY, *Appellant.*

(190 P. 2d 349)

Opinion filed March 6, 1948.

*George Siefkin,* of Wichita, argued the cause, and *Robert C. Foulston, Andrew F. Schoeppel, Samuel E. Bartlett, George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Thomas E. Woods,* all of Wichita, *Don Emery, Rayburn L. Foster, R. B. F. Hummer* and *D. E. Hodges,* all of Bartlesville, Okla., were with him on the briefs for the appellant.

*Vincent F. Hiebsch,* of Wichita, argued the cause, and *Milton Zacharias* and *Eugene L. Pirtle,* both of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiffs brought this action to recover damages to their truck alleged to have resulted from defendant's negligence. The jury answered special questions adverse to plaintiffs upon each of the grounds of negligence alleged, but in answer to a question: "What, if any, negligence do you find against the defendant?" found a ground of negligence not alleged in the petition, and returned a general verdict for plaintiffs. Defendant moved for a judgment upon the answers to the special questions notwithstanding the general verdict and plaintiffs filed a motion for leave to amend their petition by alleging the ground of negligence found by the jury. The court sustained plaintiffs' motion to amend and rendered judgment for plaintiffs on the general verdict. The court overruled defendant's motion for judgment and also its motion for a new trial. Defendant has appealed.

The petition may be summarized or quoted as follows: Plaintiffs are engaged in the business of hauling oil-field equipment; defendant is engaged in exploring for producing oil and gas in this state. Sometime prior to September 6, 1945, defendant engaged from plaintiffs three trucks with their crews to assist defendant in taking a rotary drilling rig apart and moving it about half a mile and reassembling it on a new location; that while doing the work the truck crews of plaintiffs were under the direction and supervision of Jack Cahill, the agent and servant of defendant, and took their orders from him; that in assembling and raising the rig plaintiffs' AA tandem International truck was being used in raising a derrick, for which a foundation had been prepared. The truck was placed

at the bank of the foundation on the north side thereof and fastened to the foundation to make it secure. The winch line on the truck was taken off and the derrick's raising line strung through four sheaves and the running line spooled on the truck's winch. Plaintiffs further alleged:

"6. The usual and safe method of assembling and raising such a derrick was: first, to fasten guy wires or snub wires in some manner to the top of the derrick and anchored in the direction from which the derrick was being raised in order that the derrick might be prevented from falling over in the direction it is pulled when it comes to an upright position; second, 'U' bolts were used to bolt the back side of the derrick to keep it from raising up when it reached an upright position; and third, the screws on the front rig were lengthened out to stop the derrick a little before to prevent it from coming over in place too fast when it straightened up." (The amendment added after verdict reads): "fourth, for the driller to signal the truck driver and his helper to stop the raising of the rig prior to the time when it reached a point where it would fall over upon the truck.

"7. At the time in question when the rig was being reassembled and raised, a very strong wind was blowing from the south. In the raising and assembling of the rig, the truck driver of plaintiff's truck was running the winch and his helper was standing on the bed of the truck watching the line taking orders from the defendant's driller aforesaid, and passed such orders to the operator of the winch, telling him when to pull and when to stop. When the derrick was winched up to a position where the front legs of the derrick were from ten inches (10″) to twelve inches (12″) from the sockets which they were supposed to enter *upon signal from the helper, the driver stopped the motor and neutralized his winch lever.* (Our emphasis.) While the rig was in that position, it began to wobble and then was blown over upon this plaintiff's truck which was being operated to raise the rig in place.

"8. The defendant's agents and servants had negligently and carelessly failed to provide the guy wires or snubs to keep the derrick from going over; had failed to use one of the 'U' bolts which was to hold one side of the back side of the derrick and had barely started the nuts on the other side to the extent of about two threads and had failed to lengthen the front legs of the derrick to keep it a little below center to prevent it from coming over into place too fast." (The amendment added after verdict reads): "and by the negligent and careless act of the driller in failing to give a stop signal to the truck driver before the rig reached a position where it would fall over upon the truck."

There were further allegations about damages to the truck and the loss of use thereof, for which plaintiffs prayed judgment. The answer contained a general denial of matters not admitted, admitted the residence and business of the respective parties, that plaintiff's truck was being used to raise the derrick, and that the same was damaged by a falling mast or derrick which was being raised by

the use of the truck, but specifically denied the truck's crew of the plaintiffs was then acting under the direction and supervision of defendant's agent and servant Cahill, and denied that the truck was damaged to the extent alleged in the petition; and further denied that the damage was the result of any negligence on the part of defendant or its agents, servants and employees. It further alleged that the property damage of which plaintiffs complain was due or contributed to by the negligence and want of care of its own agents, servants and employees then acting within the scope of their employment, as follows: That defendant's derrick was being raised into position by means of a running line spooled on the truck's winch, which was being operated by plaintiffs' truck driver, George Soles, and his helper; that it was the duty of plaintiffs' employees, both of whom were experienced and skilled in such an operation, to disengage the winch as the derrick or mast neared the vertical that it might be secured in position by defendant's employees, but that each of plaintiffs' employees, without disengaging the winch, negligently and carelessly deserted their posts as the derrick or mast so neared position, with the result that it was drawn past the vertical by the raising line attached to the truck's winch; that upon being so drawn past the vertical the derrick fell to the ground over and across plaintiffs' truck, and that such negligent and careless acts on the part of plaintiffs' employees were the proximate cause of plaintiffs' damage.

Defendant also filed a cross petition in which it repleaded the allegations of the answer and alleged that by reason of the negligent operation of plaintiffs' truck and winch by its agents, servants and employees the upper two sections of the ninety-six foot double Franks derrick of the defendant were damaged beyond repair, and alleged the cost of replacing the same and other items of expense in connection therewith, for which it prayed judgment. It further alleged that its agents, servants and employees were acting with due care and were without fault in the premises and that the fall of the derrick and damages resulting therefrom were proximately caused by and were wholly due to the negligence and want of care of plaintiffs' employees, as previously stated.

Plaintiffs' reply to the answer was a general denial. They answered the cross petition by a general denial and by further alleging that plaintiffs' agents, servants and employees in reassembling and raising the derrick worked under the direct supervision of defend-

ant's driller, Jack Cahill, who directed the lift line be spooled upon plaintiffs' truck, that it be attached to the top of the derrick, and directed the crew to commence to raise the derrick, and continued to direct the raising of the derrick in that he continued to signal to the truck crew to continue the lifting of the derrick; that the raising of the derrick was a slow process, and when the derrick was lifted to nearly an upright position Cahill kept a level against it in order to determine when it was pulled to near an upright position; that Cahill was the only man upon the job who, through the instrument he used, was in position to tell when the derrick was coming into an upright position; that he continued to signal the truck crew to spool in the line, lifting the derrick until it reached the position where it started to go over and fall upon plaintiffs' truck, and that at no time did the truck crew fail to obey the signals given by Cahill in the raising of the derrick. It was further alleged that if defendant suffered any damages, as alleged in its cross petition, that its damage was the direct and proximate result of the negligent acts of defendant's servant, as set out in the answer and in the plaintiffs' petition. The prayer was that defendant take nothing in its cross petition.

At the trial in the opening statement to the jury counsel for plaintiffs reiterated the negligence of which plaintiffs had alleged as follows:

"The evidence will show you that after the thing blew over, it was found that the Phillips employees had not lengthened their screws in front they had never been moved out of the legs of the derrick; that the U bolt taps or nuts were put on one side a very little distance and not on the other; that no snubbing line was used so that there was nothing to prevent that derrick from coming over fast and with the wind it came over and falling, damaged the truck as I have pointed out to you."

The Franks derrick being raised weighed about ten tons. It was a steel shaft ninety-six feet long and eight feet square at the base. When raised it sat on a platform constructed for that purpose, which was about two inches higher on one side than the other. The shaft was put in position to be raised with its base near the platform on its low side, which was spoken of in the record as the "near" side. The truck used to raise it was placed on the opposite side of the platform. It was equipped with a raising line which was attached to the shaft, run over certain pulleys on the truck, and the raising was done by winch on the truck operated with power supplied by the truck. When the shaft was raised it sat on four legs. Its center of gravity was about twenty-six inches from the near side. On the

near side of the platform, at each leg, were U bolts to be placed on the legs to fasten them to the base. The bolts could be inserted in the legs after the derrick had been raised to more than a forty-five-degree angle, but the nuts on them could not be tightened until the shaft was practically vertical. These U bolts had nothing to do with the raising of the derrick, but were simply to steady it after it was in place. On the far side there were leg screws that could be extended into slots and connected with the base for the purpose of stabilizing that side of the shaft.

Plaintiffs' employees on the work were George Soles, who handled the truck and the winch, and Jim Smith, his helper. Jack Cahill, defendant's employee, was the driller in general charge of raising the derrick. Defendant's employees, John Olson and Charles W. Reich, were to put in the U bolts and adjust and set the screws upon the far side. After the raising of the derrick started it was raised slowly, and the time it took to raise it to a vertical position was estimated by the witness as from twenty to thirty minutes. In the raising of the derrick it was intended that it should be pulled steadily up and not stopped until it would get into a vertical position. Pertinent portions of the evidence will be referred to later.

The jury returned a general verdict for plaintiffs for $5,408, and were asked and answered special questions as follows:

"1. On September 16, 1945, was it the custom and practice in the Kansas oil field to use snub wires or guy wires in raising the kind of Franks derrick involved herein? A. No.

"2. When the legs of the derrick reach a position approximately ten to twelve inches from the socket they were supposed to enter, did the driver of the Uhl truck neutralize the winch on the truck? A. No.

"3. Was there an unusually strong wind blowing at the time in question? A. No. (Strong wind) . . .

"5. Did the wind cause the derrick to be blown over? A. No.

"6. Was the falling of the rig an unavoidable accident as defined in the court's instructions? A. Was avoidable.

"No. 7. What, if any, negligence do you find against the plaintiff? A. None.

"8. What, if any, negligence do you find against the defendant? A. Driller failed to give stop signal.

"9. What, if anything, do you allow the plaintiff for:

"(a) Damage to truck?     A. $4,737.00
 (b) Loss of use of truck? A.    671.00"

Nothing was allowed defendant on its cross petition.

After the verdict was received plaintiffs filed a "motion for leave to amend petition to conform to the proof," alleging as the usual

and safe method of assembling and raising the derrick the following:

"Fourth, for the driller to signal the truck driver and his helper to stop the raising of the rig prior to the time when it reached a point where it would fall over upon the truck."

In the petition upon which the case was tried plaintiffs had alleged (paragraph 7):

"When the derrick was winched up to a position where the front legs of the derrick were from ten inches (10″) to twelve inches (12″) from the sockets which they were supposed to enter *upon signal from the helper,* the driver stopped the motor and neutralized his winch lever." (Emphasis ours.)

This allegation included a contention that the driver, George Soles, was acting upon signals from his helper, not upon signals from Cahill. So the amendment offered was a specific change from the allegations of the petition upon which the trial was had. The helper, Jim Smith, testified in harmony with the petition, that is, that he did give Soles directions substantially as alleged in the petition; hence, this change requested was not "to conform to the proof." More than that, no witness called by either party testified that it was the duty of the driller Cahill to signal the truck driver Soles, or his helper Smith, to stop the raising of the rig; hence that part of the proposed amendment did not conform to proof and raised an issue that never was presented by the petition upon which the case was tried and never was in fact tried to the jury. Plaintiffs sought to amend their petition further by adding to the eighth paragraph, which set out the negligence upon which plaintiffs relied, the following:

"And by the negligent and careless act of the driller in failing to give a stop signal to the truck driver before the rig reached a position where it would fall over upon the truck."

Several witnesses called by each of the parties testified that Cahill gave no stop signal to Soles and his helper. Plaintiffs in their answer to defendant's cross petition alleged in detail that Cahill not only directed the truck crew to commence to raise the derrick, but that he continued such directions, and "that he continued to signal to the truck crew to continue the lifting of the derrick." So, if the answer to defendant's cross petition is to be taken into account, a matter which we need not determine, the amendment sought was in direct contradiction to plaintiffs' allegations. There was, however, no evidence from any witness to sustain the allegations of the plaintiffs in their answer to defendant's cross petition with re-

spect to Cahill giving any signal to the truck driver after the start of the raising of the derrick. Indeed, it was in effect conceded by all parties and testified to by a number of witnesses that Cahill gave no signal to Soles or his helper after the start of the raising of the derrick. So, if the liability of defendant rested upon the question of whether Cahill gave any signal to Soles or his helper to stop as the derrick neared the vertical, there would have been nothing to try in this case except the amount of the liability. It is clear that no such issue was presented by the pleadings or tried by the jury. The question of whether the failure of Cahill to give directions to Soles and his helper to stop the derrick was a proximate cause of the falling of the derrick and resulting damages never was raised by the pleadings and never was tried by the jury. It seems clear that defendant should be entitled to a trial upon that issue before having judgment rendered against it.

As authority for the ruling of the trial court plaintiffs cite our statute (G. S. 1935, 60-759), the pertinent portions of which read:

"The court or judge may, before or after judgment, *in furtherance of justice* and on such terms as may be proper, amend any pleading, process or proceeding by adding or striking out the name of any party, or correcting a mistake in the name of a party, or a mistake in any other respect, or by inserting other allegations material to the case, or conform the pleading or proceeding to the facts proved, *when such amendment does not change substantially the claim or defense; . . .*" (Emphasis ours.)

In *Irwin v. Paulett*, 1 Kan. 418 (reprint, p. 392), it was held that "The authority to allow amendments to pleadings is derived from the code alone"; and the word "claim" as used in our statute (now G. S. 1935, 60-759) was *construed* to mean the plaintiff's right of action appearing in the pleadings."

Plaintiffs in their petition claimed that the wind blew the derrick over and that defendant was negligent in not having snub wires or guy wires attached to the top of the derrick to keep it from going over. The jury specifically found that it was not the custom or practice to use snub wires or guy wires in raising a derrick of this kind; that there was no unusually strong wind at the time and that the wind did not cause the derrick to be blown over. (Special questions and answers Nos. 1, 3 and 5.) There is no contention here that there was not ample, competent evidence to sustain these findings. George Soles testified that he had been employed by the plaintiffs about four years operating their truck; that he had raised as many as 150 or 175 derricks of this kind and had raised this

particular derrick as many as fifty times, and that a snub wire or guy wire never had been used. Plaintiffs had alleged that when the derrick was winched up so its front legs were from ten to twelve inches from the sockets they were supposed to enter, the driver "stopped the motor and neutralized his winch lever." Answering question No. 2, the jury found against plaintiffs on that allegation. There was a conflict of evidence as to whether the driver of the truck neutralized the winch before he ran away from the truck. Indeed, there was some evidence that the winch was still running after the derrick had fallen. Certainly, if the winch was not neutralized, the explanation of why the derrick fell is simple—the winch would continue to pull the derrick and it would have to fall. There is a conflict in the evidence as to whether the derrick wobbled when it neared the position of vertical. Obviously Soles and his helper, Smith, thought it did. There was other evidence to the contrary. At any rate Smith, according to his testimony, when the derrick was about vertical told Soles to "Hold it a minute," and a moment later jumped off the truck and told Soles, "Run for your life; boy, that thing is coming." Both of them ran from the truck a distance of about seventy-five feet before the derrick fell. It was the contention of defendant that before the derrick got high enough for the U bolts to be put in and fastened, or for the set screws to be pulled out on the far side of the derrick, Cahill, who was on the platform with his level, heard Jim Smith say: "Watch out, here she comes." He looked over toward the derrick and saw Soles and Smith running away. He then got off the platform and got away about fifteen feet when the derrick fell. It was a part of Cahill's business to get on the platform as the derrick approached vertical with a level to place against the derrick so he could tell when it was getting about vertical, while defendant's other employees, Reich and Olson, were putting on the U bolts. They testified that the derrick had not become near enough vertical so that Cahill could use his level and the other men could get the U bolts put in and screwed up when Soles and Smith left the truck and ran away. These portions of evidence are mentioned not because we are attempting to weigh the evidence, but to show that there was substantial evidence to sustain the answers of the jury to the special questions.

It appears clear that every claim for judgment against defendant made by plaintiffs in their petition was negatived by the findings of the jury in their answers to special questions. In answering

special question No. 8 the jury found a ground of liability against defendant which plaintiffs had not claimed in their petition. Here the claims made by plaintiffs as a basis for judgment against defendant and the acts of negligence alleged by plaintiffs in their petition are negatived by the answers of the jury in two ways: *First,* by specifically finding against the plaintiffs in answers to their questions one to five, and *second,* by a finding of an entirely different ground of negligence in their answer to question No. 8. It is well settled by many decisions of this court that in an action for negligence predicated upon several grounds of negligence the answer of the jury finding defendant negligent upon one ground only is a finding against the plaintiff on all the other grounds of negligence claimed in his petition. It is also well settled by our previous decisions that in an action predicated upon several grounds of negligence, if the jury returns a general verdict in favor of the plaintiff, but finds a ground of negligence not alleged in the petition, the general verdict of the jury cannot stand. These points are so well established and are so thoroughly covered in recent decisions of our court that we need to cite only a few of them. See *Haley v. Kansas City Public Ser. Co.,* 154 Kan. 477, 119 P. 2d 449, where both principles are discussed and numerous authorities cited. In that case the plaintiff was riding upon defendant's bus and alleged she was injured when the operator of the bus caused the bus to stop suddenly, throwing her out of the seat. The jury did not find that negligence, but did find the operator of the bus was negligent by not observing an oncoming car in time to prevent a more or less sudden stop. It was there held that the general verdict for plaintiff should be set aside and the defendant given judgment on its motion for judgment upon the answers to the special questions. The same principle was applied in *Olsburg State Bank v. Anderson,* 157 Kan. 463, 142 P. 2d 712, which was a suit upon a promissory note in which the defendant alleged several acts of fraud which induced its execution. Answering a special question the jury found an act of fraud which had not been alleged in the petition. This court held that finding negatived all acts of fraud alleged by plaintiff and that the general verdict for defendant should be set aside and plaintiff's motion for judgment in its favor sustained upon the answers to the special questions. In each of these cases many of our prior decisions to the same effect are cited.

It seems clear, therefore, that defendant was entitled to judgment

upon the answers of the jury to the special questions notwithstanding the general verdict for plaintiffs. Defendant's right in this regard is defeated, if at all, only by the amendments to the petition which the court permitted plaintiffs to make.

We think our statute (G. S. 1935, 60-759) did not authorize the court to allow the amendment to the petition which plaintiffs requested after verdict. The statute is a grant of authority with limitations. One limitation is that the amendment must be "in furtherance of justice." The amendment was requested to conform to proof. An amendment to paragraph 6 of the petition did not conform to proof inasmuch as no one testified that it was the duty of defendant's driller Cahill to give the operator of plaintiffs' truck, Soles, a stop signal as the derrick reached a vertical position. In fact plaintiffs' truck helper, Jim Smith, assumed the duty of watching the derrick when it got to be near a vertical position and giving directions to Soles, who was operating the winch, with respect thereto. No showing was made by plaintiffs as to any oversight or mistake which caused plaintiffs not to make that allegation in the first place, if it was one to be relied upon. Obviously the motion to amend was an afterthought prompted by the answers given by the jury to the special questions. Both amendments which plaintiffs asked to have made changed materially the claims of plaintiffs and presented issues of liability of the defendant which had not been tried. Even if no such stop signal had been given, which everyone conceded, the question of whether that fact had anything to do with the falling of the derrick, and hence was a proximate cause of its falling, certainly was a question never tried. The statute contained a limitation upon the authority of the court to permit such an amendment. The reading of the statute itself and the following cases support our conclusion in this respect: *Fire Ins. Co. v. Amick,* 37 Kan. 73, 14 Pac. 454; *Walker v. O'Connell,* 59 Kan. 306, 52 Pac. 894; *Jewett v. Malott,* 60 Kan. 509, 57 Pac. 100; *Railway Co. v. Henrie,* 63 Kan. 330, 65 Pac. 665; *Watson v. Watson,* 110 Kan. 326, 203 Pac. 714; *Birch v. Solomon Nat'l Bank,* 125 Kan. 211, 263 Pac. 1044; *Blashum v. St. Joseph Catholic Society,* 140 Kan. 290, 36 P. 2d 957; *Stroud v. Sinclair Refining Co.,* 145 Kan. 214, 64 P. 2d 1256; *Beloit Bldg. Co. v. Quinn,* 145 Kan. 507, 66 P. 2d 549.

The result is that the judgment of the trial court should be reversed with directions to deny plaintiffs' motion to amend their

petition and to grant defendant's motion for judgment on the answers to the special questions notwithstanding the general verdict.

It is so ordered.

BURCH, J., not participating.